UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. _____

MACBEG DE OCCIDENTE S.A. de
C.V., a foreign corporation,

        Plaintiff,

v.

KALOTI METALS & LOGISTICS, LLC,
a Florida limited liability company,

        Defendant.
_____/

## COMPLAINT

Plaintiff, MACBEG DE OCCIDENTE S.A. de C.V. ("Macbeg"), a foreign corporation, by and through its undersigned counsel, sues Defendant, KALOTI METALS & LOGISTICS, LLC ("Kaloti"), a Florida limited liability company, and alleges as follows:

### Jurisdiction, Parties, and Venue

1. Plaintiff, Macbeg, is a Mexican company with its principal place of business in Mexico.

2. Defendant, Kaloti, is a Florida limited liability company with its principal place of business in Miami, Florida.

3. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) and 28 U.S.C. § 1332(c)(1) inasmuch as the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and the action is between a Mexican corporation and a Florida limited liability company.

4. All conditions precedent to the prosecution of this action have been satisfied, fulfilled, extinguished, waived, or otherwise excused.

## General Allegations

5. On or about June 2011, Plaintiff Macbeg engaged Defendant Kaloti for its assaying and refinery services with respect to precious metal scrap gold and silver bars obtained by Macbeg from its clients in Mexico.

6. An assay is a scientific analysis of impure or unrefined metal to determine the presence, absence, or quantity of one or more elements. Precious metals, like gold and silver, are assayed to test the purity of the metal.

7. Because it is impossible to precisely determine the pure content of impure scrap bars of gold and silver prior to conducting an assay, the industry standard is that the final quantity is agreed upon after the assay has been conducted and the precious metals content determined.

8. In accordance with these standards, the parties agreed that Macbeg would ship the precious metal scrap gold and silver bars that it obtained in Mexico to Kaloti, along with an estimate of the precious metal content (i.e., gold and silver) that each shipment would yield.

9. Based on said estimate, Kaloti would pay Macbeg 97% of the expected value for each shipment upon delivery, using the market price at the time of the shipment to lock-in the price for each respective shipment.

10. The parties maintained a running log of the shipments to Kaloti and, after Kaloti conducted a fire assay, would use the precious metals content ultimately determined by Kaloti's assaying services to finalize the remaining payment due for each shipment.

11. Over time (a few months), and following several complaints from its own customers in Mexico, Macbeg confronted Kaloti about the fact that the quantity of gold ultimately determined by Kaloti per its assays for each shipment was consistently, and without fail, lower than the amount determined by Macbeg prior to shipment.

12. On or about September 2011, after contacting Kaloti about this issue and due to their dispute regarding Kaloti's calculations of the gold contained in Macbeg's shipments, Macbeg and Kaloti agreed to submit various retained samples of the shipments to a third party – Alex Stewart International – for analysis.

13. Submitting samples to an agreed-upon, non-interested third party is a customary practice within the industry to assist parties that have a dispute with regard to assaying services.

14. The parties agreed on Alex Stewart International because it is a respected and recognized international network of laboratories that is known to provide reliable weighing, sampling and inspection services in accordance with ISO accreditation standards.

15. The parties initially submitted 18 samples retained by Kaloti to Alex Stewart International for analysis. True and correct copies of the Analysis Reports received from Alex Stewart International for the referenced samples are attached hereto as **Composite Exhibit A**.

16. The results of Alex Stewart International's analysis revealed that, for each of the 18 samples tested, without exception, Kaloti had understated the quantity of gold that was contained in Macbeg's shipments.

17. After the initial 18 samples were analyzed, the parties submitted an additional 28 samples retained by Kaloti to Alex Stewart International for analysis. This included Kaloti's second set of samples corresponding to the original 18 samples submitted, as well as an

additional 10 samples. True and correct copies of the Analysis Reports received from Alex Stewart International for the referenced samples are attached hereto as **Composite Exhibit B**.

18. The results again revealed that, for each of the samples tested, without exception, Kaloti had understated the quantity of gold that was contained in Macbeg's shipments.

19. Macbeg subsequently submitted six additional samples on its own to Alex Stewart International's New Jersey laboratory for analysis, and again, the results revealed that Kaloti had systematically understated the quantity of gold that was contained in Macbeg's shipments. True and correct copies of the Analysis Reports received from Alex Stewart International for the referenced samples are attached hereto as **Composite Exhibit C**.

20. Macbeg did not typically retain its own samples, however, for the final few shipments – after the dispute with Kaloti had arisen – Macbeg had a representative present when Kaloti received the gold and conducted the fire assay, and was therefore able to retain samples of its own. Those are the samples referenced in paragraph 19 above.

21. Attached hereto as **Exhibit D** is an internal chart maintained by Macbeg reflecting the differences between Kaloti's and Alex Stewart International's determination of the quantity of gold that was contained in Macbeg's shipments for each of the aforementioned samples submitted to Alex Stewart International.

22. Based on Alex Stewart International's analyses, these sample-sets alone reflected an undervaluation totaling 62.89 ounces, or an average rate of error of 0.36% per sample. These discrepancies – which systematically and overwhelmingly shorted Macbeg – exceed any acceptable rate of error within the industry and cannot be categorized as a statistical anomaly, but rather a willful undervaluation on the part of Kaloti.

23. Following the receipt of these results from Alex Stewart International, the parties attempted to amicably resolve the dispute to no avail. Kaloti acknowledged in writing that all of the results received from Alex Stewart International were favorable to Macbeg, but refused pay Macbeg the difference reflected in the results.

24. Based on the fact that the samples submitted for analysis revealed that Kaloti had systematically understated the quantity of gold that was contained in those shipments, Macbeg maintains it has suffered additional damages with respect to all of the *other* shipments for which samples have never been submitted for analysis.

25. On October 19, 2011, Macbeg's principal Martin Bernal submitted a written request to Kaloti in which he requested that all samples for every shipment ever delivered to Kaloti by Macbeg be submitted for analysis. Kaloti never complied with this request.

26. Additionally, Macbeg has discovered that, in addition to systematically undervaluing the quantity of gold that was contained in the shipments for which Kaloti credited Macbeg, Kaloti also shorted Macbeg an additional 118.28 ounces of gold. These 118.28 ounces were delivered by Macbeg, but never credited by Kaloti.

27. To date, Kaloti has refused to pay for all of the gold delivered by Macbeg, nor has it ever agreed to return the gold to Macbeg.

28. Additionally, Macbeg has delivered 3,993.55 ounces of unrefined silver for which – as a result of this dispute – Kaloti has failed to make payment. Kaloti has previously acknowledged receipt of this silver at the agreed upon price of $33.00/ounce.

29. Macbeg has demanded payment by Kaloti for the silver, but Kaloti has failed to pay the amount owed to date.

30. Due to Kaloti's actions, it has been necessary for Macbeg to employ attorneys to file and prosecute this action, for which Macbeg will incur costs, attorneys' fees, as well as other expenses.

## COUNT I – BREACH OF CONTRACT

31. Macbeg incorporates paragraphs 1 through 30 above, as if set forth herein.

32. Macbeg and Kaloti entered into a valid agreement, pursuant to which Kaloti agreed to pay Macbeg the agreed-upon market price for gold and silver delivered to Kaloti for assaying and refinery services.

33. True and correct copies of Macbeg's invoices and Kaloti's Scrap Purchase confirmations, evidencing the parties' agreement for each shipment from Macbeg to Kaloti, are attached hereto as **Composite Exhibit E**.

34. By systematically undervaluing the quantity of gold that was contained in Macbeg's shipments, and therefore failing to pay the agreed upon price for the total amount of precious metal contained in the lots delivered by Macbeg, Kaloti breached the parties' agreement.

35. As a result of Kaloti's material breach of the parties' agreement, Macbeg has been damaged and will continue to suffer damages.

36. Macbeg has never received full payment for the correct amount of gold that it delivered to Kaloti.

37. Moreover, Macbeg has delivered 3,993.55 ounces of unrefined silver for which Kaloti has failed to make payment.

38. Kaloti has previously acknowledged receipt of this silver at the agreed upon price of $33.00/ounce.

39. Nevertheless, and despite Macbeg's demands, Kaloti has refused to pay for the referenced silver and Macbeg has been damaged.

40. Lastly, as a direct result of Kaloti's actions, Macbeg has lost several clients of its own in Mexico.

WHEREFORE, Plaintiff Macbeg, respectfully requests that this Court enter judgment awarding damages, awarding costs, including attorneys' fees, and such other and further relief as this Court deems just and proper.

## COUNT II – VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

41. Macbeg incorporates paragraphs 1 through 30 above, as if set forth herein.

42. This is a claim for violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. ("FDUTPA").

43. FDUTPA was enacted to prevent deceptive and unfair trade practices in the nature of the bad acts of Kaloti set forth above.

44. Kaloti has violated FDUPTA by knowingly, willfully, and systematically undervaluing and misrepresenting to Macbeg the quantity of gold that was contained in Macbeg's shipments.

45. Kaloti's conduct caused Macbeg to never receive full payment for the correct amount of gold that it delivered to Kaloti and, moreover, caused Macbeg to lose several clients of its own in Mexico.

46. Macbeg has suffered damages as a result of Kaloti's wrongful conduct.

WHEREFORE, Plaintiff Macbeg, respectfully requests that this Court enter judgment awarding damages, awarding costs, including attorneys' fees, and such other and further relief as this Court deems just and proper.

{24527163;5}

AKERMAN SENTERFITT, ONE SOUTHEAST THIRD AVENUE, SUITE 2500, MIAMI, FL 33131-1714

**Dated:** November 8, 2012.

                          Respectfully submitted,

                          **AKERMAN SENTERFITT**
                          *Counsel for Plaintiff Macbeg*
                          One Southeast Third Avenue
                          25th Floor
                          Miami, Florida 33131-1704
                          Phone: (305) 374-5600
                          Fax: (305) 374-5095

                          By: /s/ Marc J. Gottlieb
                              Marc J. Gottlieb, Esq.
                              Florida Bar Number: 827819
                              Michael O. Mena, Esq.
                              Florida Bar Number: 010664

{24527163;5}